Next case is case number 4-17-0660. In re the Marriage of Kuhn. Appearing for the appellant is attorney Jason Schuting. Is that the correct pronunciation? Thank you. And for the appellee is attorney Robert Bonjean. Good afternoon, counsel. For the record, I'll just note that accommodations have been made such that two signing interpreters are present in court and are signing for the parties today. Is that correct? Yes, your honor. All right. Mr. Schutte, are you ready to proceed? You may. May it please the court, counsel, your honors. The main issue in this case, the main issue that this case presents is whether the removal of the parties for deaf and hard-hearing children is in those children's best interest. As I'm sure the court is well-versed and aware, these actions are governed by the Elementary Marriage and Dissolution Act and major precedence was set in these cases by our Supreme Court in the Eckert case. The Eckert court noted that these cases must be determined on a case-by-case basis depending to a great extent upon the circumstances of each case. I would affirm to the court that this case presents some unique circumstances in light of the unique needs of the children being deaf and hard-hearing. The children are at certain risk in light of the special needs of their education. Angie Kuhn, a witness for CURT, the appellee, clearly testified that deaf children suffer language delays. They often have difficulties academically. They underperform in their schooling. Allison Giedich, another witness presented by CURT, testified that learning to read and write is a problem worldwide for deaf and hard-hearing children. These problems, in the end, into adulthood can result in underemployment of these children when they reach adulthood. These problems are central to this case and they're central to the motivation of my client, Claire Rawlings, in seeking removal of these children from the state of Illinois to pursue a better education at the state of Indiana, at the Indiana School for the Deaf. Now, foremost to this case should be the issue of the educational opportunities presented currently where the children are enrolled in school at the Illinois School for the Deaf versus those opportunities as presented at the Indiana School for the Deaf. We believe that the evidence at trial has undeniably showed that the Indiana School for the Deaf provides a better education, educational opportunities for the children than what they are currently receiving at the Illinois School for the Deaf. Counsel? Sure. Does that apply to all four children? Your Honor, I believe it would apply to all four children and specifically, not only do I believe it applies to all four children, I think it must be considered for all four children to keep them together as a cohesive family unit. But what we believe the evidence in this case shows is some very common things from not just the children of parties, but the other witnesses who presented testimony and those are that the Illinois School for the Deaf has routinely failed to implement and educate through these deaf and hard-hearing children's native language of American Sign Language. Also, multiple families have presented testimony of the poor performance of their children while enrolled at the Illinois School for the Deaf. These failures have resulted in poor communication ability of these deaf children. Also, there's been extensive testimony of a lack of deaf role models at this school and an unhappy school environment. Likewise, there's a lack of opportunity at the Illinois School for the Deaf as far as opportunities and coursework and also extracurricular activities. And lastly, the evidence has just shown there's a better educational curriculum and opportunities at the Indiana School for the Deaf as opposed to the Illinois School for the Deaf. Now the evidence further shows that the native language of all four of these children is ASL. Certainly there's been testimony that Claudia and Covino are capable of speaking and do speak, but their father communicates with them in ASL, their mother communicates with them in ASL, and all of the children communicate with each other in ASL specifically because Corbin and Selene only communicate in ASL. Yes, sir. Counsel, I want to make or be clear in my mind as to which rulings your client is appealing. As I read your client's brief, it is apparent that she is seeking review of the trial court's denial of her petition to relocate. However, the trial court also denied her petition seeking to modify the allocation of decision making responsibilities and granted the petitioner's petition to modify the allocation of parent and time. Are you seeking review of those rulings as well? Yes, your honor. I believe they are linked because we can't have my client's petition to relocate granted without the change in parenting responsibilities and also parenting time. Parenting time based on the prior schedule just wouldn't be, you couldn't do it based upon the difference. But as I read your brief, the factors that you highlight, the statutory factors that you highlight and address are limited to those relating to the petition to relocate and do not specify the statutory factors for a trial court's ruling on a petition for decision making responsibilities or allocation of parenting time. You are correct, your honor. I focused on the section of the statute that discusses best interest under relocation. And I believe the appellee focused on the other factors that focus on parenting time and parenting responsibilities. I requested at the trial court that the parenting responsibilities and time be modified. And I did focus on the relocation as the main issue because I see that as the driving issue in this case. The other best interest factors under those other two statutes are not exactly the same, but there's certainly overlap in them. And I think that the court can consider all of those factors as far as the matters at issue in this case. But yes, we are asking for the court to reconsider not just relocation, but also parenting responsibility and parenting time. I think it's necessary to talk about some of the facts of this case, even though I know the briefs are filled with them and this is a voluminous case as far as a family law case is concerned. But if we look at Corbin, Corbin is now 10 years old. He is completely deaf. At 10 years old, he communicates by gesturing at things. Very brief communications. This child can't communicate. His school records show that he uses one sign utterances and points to things to communicate at the age of 10. This description of his ability to communicate isn't just recorded in one of his individualized education programs. It spans years where his individualized education program describes this as this boy's ability to communicate. He was a third grader in the prior year before we tried this matter. At that point in time, his reading and language education was provided at the level of a first grader. His expressive language was noted to have contained grammatical errors and lacked detail. And he was functioning below grade level in math. In fact, some of his scores show that over an extended period of time from August 2015 through March of 2016, he improved by three months. And at that point in time, was still being educated at a first grader's level when he was in the third grade. He spent the cued speech, which is an issue in this case. He's been educated with this tool since kindergarten. He's now in the third grade. Still behind. The witnesses testify that he is not progressing year for year. So what we see is every year that Corbin is in school at the Illinois School for the Deaf, he is going to progressively fall behind based upon the prior history. Angela Kuhn testified when presented with this evidence. She admitted, while she testified extensively for Kurt that Corbin was progressing, she admitted this is not much improvement as recorded in Corbin's own individualized education report. And Kurt stressed in his testimony that he felt Corbin was meeting goals, meeting the goals in this case. And I think this is where we can see how the parties differ and why we're here before the court today. Because we do not believe that continuing to be educated at first grade level for multiple years and being unable to communicate should be a satisfactory accomplishment as far as goals go for a student in third grade at a specialized education school such as the Illinois School for the Deaf. Regarding Selene, this is the triplet who is deaf. The other two are cloding for being hard of hearing. Her language skills at the time of trial were half that of other children her age. Her sisters who can speak and hear via the use of hearing aids were slightly better, but they were also delayed and behind. Megan Scott, another witness for Kurt and the speech pathologist at the school admits that Selene is very delayed. To touch base a little bit on the acute speech that is a major issue in this case, there's been absolutely no verifiable evidence or data to show that acute speech actually improves the education for deaf and hard of hearing students. In fact, Angela Kuhn admitted that a very similar tool, Visual Phonics, which was discussed at trial and utilized at the Illinois School for the Deaf before acute speech was implemented, had suffered limitations and it was discontinued at the school as a result. Alternatively, every witness in this case has agreed that children can learn English and to write it and communicate with English via the use of American Sign Language, the base language for communication for deaf people in the United States. Further Your Honors, I think the main issue in this case and one of the most important things is that Claire has presented the only witnesses in this case that have experienced education at the Illinois School for the Deaf and experienced the education provided at the Indian School for the Deaf. We look at the low. They had several children that were initially being educated in Alabama at a school that taught deaf and hard of hearing students in solely ASL. The children were performing at grade level before they were moved to the school. They were enrolled at the Illinois School for the Deaf and the Lowe's were advised that their children would be instructed in acute speech for 15 minutes a day. The Lowe's found out that that was not true and they were in fact being instructed acute speech all day. Let's assume that everything that you said and everything that your client's side alleged is proven. Does that mean the trial court was to disregard the other ten factors contained within the statute under which you've acknowledged you're pursuing a repeal? Your Honor, I don't think it would mean... Your Honor, I'm not trying to say that they should only rely on this one factor. My point is to emphasize that I think it is far and foremost the most important factor. Now, I do not think the court should disregard and I don't think that it would be appropriate to disregard those factors. I take issue with the way the court weighed those factors, but they certainly also apply. Have I answered your question? Going back to the Lowe's children, we found out that they weren't being told the truth. The kids were being educated in acute speech all day and what they learned is that it wasn't effective. The children weren't understanding it. The children fell behind and made no progress in two years of instruction at the Illinois School for the Deaf. And I'd assert that the dishonesty to Lowe's and the use of this program, and to an extent not allowed or approved by them, was a violation of these children's rights under various laws including the ADA and IDEA. Now, what we learned is that the Lowe's, after hearing this and seeing the lack of progress with their children, removed the children from the school and took them to the Indiana School for the Deaf where they were instructed solely in ASL. After testing, they learned that the children were more than a year behind after leaving the Illinois School for the Deaf. And since being enrolled in the Indiana School for the Deaf, the children's reading, writing and communication has improved. The children are very happy and they have some very positive role models. Also, Lowe's told us, which is a continuing theme here at the school, at the Illinois School, that they felt the teachers at the Illinois School for the Deaf were more concerned about implementing acute speech than actually focusing on instruction and progression of the children that were enrolled at the Illinois School. Bob Drayman provided very similar testimony. Bob's a very educated man, a very educated deaf man. He's an alumni from the Illinois School for the Deaf. He taught at the Illinois School for the Deaf. They were provided ASL instruction. He taught as a substitute teacher at the Indiana School for the Deaf when he transferred his students there. What we learned from Bob's testimony is that he believes that instruction and fluency in ASL improves a deaf individual's ability to learn to read and write. He also testified that multiple modes of communication are used at the same time at the Illinois School for the Deaf. If proper translation isn't provided, deaf students could miss the communication. His daughter, Ariella, affirmed this with a very fact-specific scenario that happened to her when she was left behind in a communication in class because one of the children was speaking audibly. Ariella couldn't hear it and it wasn't translated. Going back to Mr. Drayman's experience at the school, he traveled to the Indiana School because he felt that the instruction at the Illinois School for the Deaf was slower by comparison than other schools. He was also upset that his children were never meeting the goals included in their IEPs, similar to the situation with the kids in this case. Mr. Drayman traveled there and his testimony was he was shocked at how wonderful that school was. He was very impressed with the opportunities presented, the courses that were available at the Indiana School for the Deaf that weren't available at the Illinois School for the Deaf. And that's documented in the curriculum that is in the Record on Appeal. His kids, he testified about their changes and their improvement after attending school here. By his own testimony, he said their knowledge exploded. Their ability to communicate greatly increased from short, brief communications to in-depth, back-and-forth communication. That's exactly the problem we see with Corbin Kemp. What's our standard? In this case, it's against the manifest way, Your Honor. I felt you did a very good job of laying out the advantages of the Indiana School versus the Illinois School. Sure. And I think that the evidence, in my opinion, is overwhelming in that regard. That having been said, the trial court is confronted with having to weigh all of these additional factors. Sir. I take your argument to be that we are so strong on one factor, that should outweigh everything else. Your Honor, I think that wouldn't exactly be what I'm saying. What I'm saying is I think that it should be granted more weight than the other factors. And I think that the case law tells us that this court can do that in a trial court as well. But I also take issue with the court's analysis of many of the factors in this case. For instance, the court stated that Kurt was much more active. I'm quoting. I don't have in front of me the order. But he believes, talking about how much more active Kurt was with the education than Claire. She was also active in education. She attended the IEPs. She, in fact, brought a due process action because she wanted to change the educational program. The evidence shows that Kurt hampered her at every move when she attempted to do something he didn't agree with. And that's why we're here today, Your Honor. And I get the fact that as far as stuff going on at the Illinois School, you've got Kurt and you've got two brothers. You've got the whole family working there. I would call that nepotism, Your Honor. So that's not my concern. Sure. As much as my concern is the trial court's confronted with all of these other issues and how they weigh into this equation. That's what I'd really like to hear more about. I don't think anybody disagrees that there's a substantial amount of evidence that relates to the nature of one school over the other. But we're confronted with, we have to review this trial court's decision and that decision had to be based on all of these factors. I understand that, Your Honor, and I agree. It did have... The red light means you have no more time. So you still have time at this point. Okay. Yes, I think the court can weigh all factors. I think that they got it wrong, Your Honor. I think they got it wrong regarding many of the factors as far as what... about whether they lied in Kurt's favor or claims. I haven't briefed that as extensively because I wanted to emphasize the educational factors. But in general, I agree that all factors have to be considered and I do not think that the court, in this case, got it right. Taking a step back, Your Honors, from where I was before we began those discussions, and to move ahead. What we see here is that the Illinois School for the Deaf has failed in their responsibility to provide a quality education to these children. There's no real argument that Claire is an unfit mother. As a matter of fact, Kurt admits in his deposition he had no objection to her fitness as a mother. So, in my mind, then, if there's no objection to her fitness as a mother, and the educational benefits, which are very important for these children with special needs at this point in time, are as they are, that they are so far behind, and that the educational opportunities at Indiana is much better, I do not see how it can not be in their best interest to be with a fit parent to pursue the best education possible to make them functional adults in their adulthood. I see my time has concluded. Thank you. Thank you, Mr. Schutte. You'll have time in rebuttal argument. May it please the court, Mr. Schutte. Clearly, we're here to talk about what's against the manifesto of the evidence. But all that's going to be wrapped up in the question of what's in the best interest for these four young children. As always is the case, the four children are different. So we're going to have to talk about the children individually and as a whole. The court's read the briefs. Obviously, I took an entirely different view of what was before the court than did Clare Rollins. How is this not an allocation of parental responsibilities case? Both parties have filed a petition asking the court to modify decision-making and parenting time. We have to start with the concept, in my mind, of looking at the decision-making issue, looking at the allocation of parenting time. Depending on where those two issues are, how they're resolved by the trial court, the trial court's then going to look at the issue of relocation. That's what the trial court did, and it only makes sense to me that that's the way the court would analyze it, because we're certainly not going to give my client the decision-making responsibilities and send the children to Indiana with their mother. That would make absolutely no sense. So the court had to look at all the factors, and the court's judgment or order is clear that it did look at all the factors in 602 as to decision-making and parenting time, and in 609 as to the relocation. What do we start with? What's the evidence? What did the trial court hear? I want to talk about caregiving to start with. And I want to start with health care, because this is an area that's troubled me throughout this case. We have a situation where two of the children are deaf, two are hard of hearing. The two hard-of-hearing children, I disagree with counsel, their native language isn't ASL or American Sign Language. Their native language is spoken English. That's what the evidence was clear of. Yes, they have to communicate with their parents using ASL, but that's not how they normally would communicate. Also would have to communicate with their siblings that way as well with ASL. Counsel, does it follow from the statement that you just made that the Illinois school is just as good, if not better than the Indiana school for those two children? Absolutely. Could you expand on that just a bit? Because Mr. Schutte seemed to make it clear in his opinion, the evidence showed that for all four children, the Indiana school was superior. I totally disagree with that, and I found in his brief this little slide-in statement that all four children should attend Indiana. I never saw any support for that statement. How do we not educate the two hearing children in the best possible environment with hearing spoken English as a communication method for their education? At the Indiana school for the deaf, the rather curious, I think that's being generous, piece of evidence was the evidence from Ariella Drayman who testified that at the Indiana school for the deaf, she has friends that hear and speak, and while they're at school, they simply turn their voices off. They turn their voices off. Why? There's no evidence, and it absolutely makes no sense to me, that the two hearing children are best served by being in an ASL only environment. There's no evidence that they're better off there. That's what you're going to be in at the Indiana school for the deaf, and I have to believe that limits their ability in the world, once they get out of school, if all of a sudden their spoken English and their English skills are limited by being in the ASL only environment. So, I hope that's answered the question, or to some extent. Thank you. Yes, sir. Now, when I was talking about caregiving, I was talking about really hearing, because I'm going to start with health care. We have two children who have an issue with cochlear implants. Both Covina and Celine suffered significant loss over the last year in their hearing. So, there was a recommendation that they have the cochlear implants. Covina needs it because Covina needs it to continue to hear so she can talk and hear like any one of us. Celine needs the cochlear implant to have a chance, as she put it, to hear and to speak like her sisters. And yet, for a reason that I cannot comprehend, mother has absolutely objected to the cochlear implants. She's done everything in her power to keep these two children from getting the cochlear implants. The reply brief states that, well, she was going to set up an appointment for a specialist in Indiana. I submit to the panel that was a hoax. That was baloney, because what happened when it was time for the cochlear implant surgery, despite that the existing court papers would give my client the authority to make that decision, despite the fact that the trial court had ordered that the surgery could proceed, mother went to the surgery appointment and made such a ruckus that the surgeon backed away and wouldn't perform the surgery. Now, how do we understand what mother would not want her two children, one to hear, continue to hear, and the other to have a chance to hear and speak like her sisters? Was she asked that question at trial? I don't think she ever was asked that question. I can't believe there's an answer for that. I would say her answer would be, her answer was given at trial when she talked about Selene and the cochlear implants and it was in an exhibit, an email, I found that out, I think it was a text message, where she said, leave her deaf soul alone. Well, I think that clearly is the case, because I think the deaf culture issue, which has now permeated the thinking of mother, has been detrimental to the children. It's detrimental to the children with respect to the hearing. I just don't understand that. How would you not want your children to be able to hear? She doesn't worry about whether or not Selene's... Do I understand you to be saying that that is her position? Your argument is, it's her position, she does not want the children to hear? I think her position is, she's not going to do anything to help them to hear. I don't know if I can take it as far as you have, Justice Miller. Obviously, I don't know what's in her mind, but everything she's done makes me fear that she isn't worried about it, because they need to communicate with her with ASL, so it's not necessarily all that important that they be able to hear and speak. The same problem occurred with Selene's hearing aids. She wouldn't have Selene wearing the hearing aids at school. When the speech pathologist was talking about, we need the hearing aids. So, how do we understand that? Mother's deaf culture attitude permeates this issue with respect to the hearing. As far as their education, the appellate argues that we should go to Indiana, because that's a better school. I think there are parts of Indiana that may be better, others may be not so much better. Indiana school has bigger classrooms. Bigger classrooms aren't going to be that helpful to Corbin, especially, because he needs individual attention, constant repetition. Corbin, by the way, he sort of ignores the fact that he has a learning disability that also creates a problem in addition to his deafness. That sort of gets pushed to the side, and that never is taken into account by the appellate. So, when we look at this education, what parent has demonstrated an active involvement in children's education in trying to enhance their education? It's their father. Father's the one that's been at school, been in the classroom on a regular basis observing, been at the speech therapy observing, has constantly contacted the teachers asking for additional help that he can give to the students, to the kids at home, has done that. Evidence about him reading to the children, helping Corbin with his homework, technically he's the only one of the four at this point that has homework, got the tutor for Corbin, has worked with the tutor. All of those things are what dad's done. What has mom done? Mom has complained about Cue's speech regularly. Mom has been at the IEP meetings. Mom has attended the programs. I think that's it. So, when we're talking about the children's education, as counsel would suggest and how important it is, which parent is better equipped? Which parent has demonstrated to the court the ability to get involved with the children's education, to be actively promoting their education? Well, there's only one of these two parents that's done that. And that's Mr. Kuhn. And I think that's an important issue, especially with all the pressure and the position that counsel takes with respect to the education. And I'm not here to say that's unimportant, but it certainly is important. It's important to my client. That's why he's been so active in promoting this. As far as the activities, that's lesser important. We have the issue of Mr. Kuhn being actively involved, promoting it, organizing the activities, mom attending them. But looking at what the trial court looked at, the involvement of the parents with respect to their health care, the parents' involvement in the education and their activities, how could a court not, looking at that evidence, decide that Mr. Rawlings, to make that decision? He couldn't, and he didn't. As far as the relationships that the children have, court heard evidence regarding the children's relationship with their father and with their mother. Difference between the two. Court heard evidence about preferences. Court heard evidence about the children's relationships with the family members. I don't think I've ever had a case in 35 plus years of doing family law where I had this many family members in the school. Now, curiously, counsel says it's nepotism. I think it's wonderful. Evidence was how these children run up to their aunts and uncles, how they greet them, they're excited to see them. The principal of the school is their aunt. These are people that are actively helping these children with their education. And that can be a bad thing? That's a wonderful thing. I'm sure Mr. Shug would argue that those people are biased towards the acute speech versus the American Sign Language, and that, at least for the two completely deaf children, that's not working well for them at the Illinois school. I don't think there's any evidence to that fact. You don't? No. We're behind. We're behind. We're behind. Behind what? Behind what a hearing child should be doing? Absolutely. Behind where these children, deaf children, behind Corbin with a child who's got a learning disability and the deafness to deal with? Is he really behind? Is he where we want him to be? Is he where my client wants him to be? Absolutely not. But is he behind? Can he get to where he needs to be with the acute speech only? Well, first of all, he's not only getting acute speech. He is instructed in ASL and acute speech. And that was, I think that's clear in his IEP, his individual education plan. It was clear from the testimony. And to say that acute speech is a problem is curious because there's evidence, and there's evidence at the trial at home when the kids are working and reading with dad and they're trying to read and use acute speech, the girls, if they ask, they're having a problem and the two hearing children aren't as good at acute speech as, they'll ask Selene, the deaf sister. If Selene can't get it, they go ask Corbin. So to suggest that these children aren't getting acute speech just isn't factually correct. That's not what the evidence was. And all the evidence before the trial court was that acute speech was helpful to these children. That was the testimony the court heard. There was no evidence to the contrary. Those were the findings the court made based on that evidence. I think the key is you've got small classes at the Illinois School for the Deaf versus 20 plus I think was the testimony of Terriella Raymond at the Indiana School for the Deaf. It would have been the pre-K program. Any importance of that smaller classroom, especially with Corbin and Selene. The other factor the court looked at was the children's home, school, and community. Counsel, in response to a question that Justice Turner asked, you indicated that the children aren't being taught exclusively the acute speech, correct? Yes. The brief of the National Association of the Deaf states at page 9 that the Illinois School for the Deaf is the only school in the United States that uses acute speech exclusively. Is that contained in the record in this case? In the children's IEPs it talks about they're instructed both in acute speech and ASL. I'm sorry. Are you asking if the association, it's been so long I should remember after three days of trying to slow down. Are you asking me if there's anything in the association that supports what the National Association or in the record that reports the National Association statement? Yes. There is none. And I would point out there are all kinds of inaccuracies in their factual statements that they gleaned from the record in their brief. Home, school, and community. They are now in a house where they were born, since they've been born. That's where they live. That's where my client is with the children. That was clear of the record. That's what was going to happen and that's where we are today. As far as their school, they're in the school they've always been in. And in my mind the evidence was clear at the hearing that they're progressing. All three of these children are progressing. Are they progressing as fast as my client wants? No. Are they doing well in his mind? They're doing what they should be doing on the one hand and yet let's do better. That's why he's the parent that's so actively involved with the children. The only educators that testified that are actually involved in the academic subjects were the educators from the Illinois School for the Deaf. Those are the only people that testified about being in the classroom with these children and knowing what was going on with the children day to day. None of Claire Raleigh's witnesses knew what went on in the classroom. None of them were there. The educators they had were ASL educators. Not that that's unimportant, but that's not the same as teaching the children the reading, the math, and the other academic subjects. I think my time's up. Thank you Mr. Bongean. Mr. Schutte, you have a rebuttal argument. Yes, Your Honor. I want to touch base on a few points that Attorney Bongean brought up. Mr. Bongean says that no educators testified on Claire's behalf. Not true. Farrah Harper testified as the first witness in the trial. The only deaf educator, aside from Bob Draymond, who did not testify about teaching the children, is the only deaf educator from this school that testified on behalf of Claire. The only one who was actually deaf. What she did is she said that the school was so bad she wouldn't send her own kids there. So that is not accurate. Regarding the educators at the School for Deaf, not a single deaf person testified on behalf of Kurt. And regarding whether Kurt agrees that the kids are doing well, he testified at trial. He thought that they were. Mr. Bongean said that the kids will go and call that being testimony at trial. In fact, his IEP at E-608 and R-316 of the record says that evaluations in May of 2015 showed that within the past year, Corbin's English vocabulary was improving. However, often he struggled to understand what he reads in language presented to him through the air via acute speech. Regarding the use of the various languages that are provided to the students in the IEPs, yeah, they say that ASL is supposed to be used, but Candy Sexton said that the IEPs weren't followed and acute speech and other languages were forced. I don't think she testified about acute speech. I believe it was phonics, a different language. But Arielle Drayman said they were forced on her when she wasn't supposed to have acute speech. And the Lowe's said the exact same thing. So those IEPs, the individualized education programs under federal law are not being followed. Your Honor, Justice Turner made an excellent point. I would argue that these witnesses are biased toward acute speech. Angela Kuhn was the parade marshal in Washington, D.C. to celebrate acute speech. She admitted that her, Sarah Dobson, another witness, and Allison Gydish were three of the main proponents of acute speech  in Washington, D.C. Regarding Curt and the health care issue, the first matter touched on by Mr. Bonge. The interesting thing is that before Curt ever made that an issue, Claire requested leave of court because Curt had final decision making on health care. She requested leave to have these children evaluated by an otolaryngologist, a doctor, for hearing in Indiana. After that, when this matter was really coming to issue, that's when Curt decided it was time to look into cochlear implants in spring form. So I find that to be a very self-serving statement. Particularly regarding his statements that he's made all these decisions in education and health care. We're here because he wouldn't allow Claire to be involved. So to make that be one of the factors in decisions to say no to Claire seems self-serving for Curt to me because he wouldn't let her do it anyway. Also, regarding Claire's involvement with the children, when Corbin was younger, she had three girls, infants, that she was taking care of as a stay-at-home mother. While Curt was allowed to work and be on campus where this child went to school, it's easy to talk to the teachers in that situation. What about if you have three infants that you're taking care of? Much harder for Claire. Then when those girls went to school, she had her little boy at home to take care of, who is 18 months old at this point in time. Does the evidence show Curt was a little more active? Sure, but Claire's been active too and it was much easier for Curt to stop in the hallway on the way up to work or after work and talk to a co-worker. Regarding the court's opinions, I wanted to touch base based on Justice DeArmond's statements. Paragraph 8, the judge says that Kishner has been the only parent actively involved in children's education. Claire pushed for the girls to be mainstreamed, the two that could hear, so she's very active, pushed for that. Curt disagreed with that. She pushed for Corbin to be mainstreamed in math. She's attended all these IEPs. The court got it wrong on that issue. My time's up. I thank you for your time and attention. Thank you, counsel. Thank you both. The case will be taken under advisement and a written decision shall issue.